DORIS VANDERFORD *vs.* HAROLD D. KETTELLE *et ux.*

MARCH 9, 1949.

PRESENT: Flynn, C. J., Capotosto, Baker, Condon and O'Connell, JJ.

CAPOTOSTO, J.   This is a bill in equity brought by the surviving grantee under a deed in joint tenancy against the grantors for the reformation of that deed on the ground of a mutual mistake of fact.   It was heard in the superior court on bill, answer and proof, and resulted in the entry of a decree granting the prayer of the bill.   From such decree the respondents have appealed to this court.

The object of the bill is to have the deed reformed so as to include therein a right-angled triangular piece of land, hereinafter more definitely identified, along the easterly line of the premises described in the deed.   Complainant's claim basically rests on an alleged oral promise by the respondent Harold D. Kettelle at the time of the conveyance that he would straighten the easterly boundary line so that it would be at a right angle with the southerly or road line of the premises instead of the acute angle described in the deed.   Since Harold D. Kettelle was acting in

behalf of himself and his wife Marjorie H. Kettelle, the other respondent, throughout the original transaction and the incidents that followed, we will hereinafter treat him as if he were the sole respondent.

The evidence, all of which we have carefully read, is highly conflicting and irreconcilable on various material points. It consists mainly of assertions, explanations and denials in relation to certain conversations and conduct that are misleading unless correlated and applied with considerable care to complainant's claim as alleged in the bill, keeping in mind at all times that it prays for the reformation of a deed and not for the determination of a claim of title in the complainant by adverse possession. The nature of the cause and the character of the testimony therefore require a rather extensive review of the evidence in order to make clear the controlling points.

Respondent is the owner of some twenty-eight acres of land bounding southerly on the former Ten Rod Road, now the Victory Highway, in the town of North Kingstown. Generally speaking, a great deal of that land is woodland, swampy in places, and covered with field stones and boulders. In 1929 the respondent built a house thereon with its front parallel to and about forty feet back from that road. The house was serviced by a septic tank, which complainant claimed was located some short distance east of the northeasterly corner of the house. Pursuant to an oral agreement the respondent conveyed those premises to Rowland P. Bowen and his wife Doris L. Bowen, now Mrs. Vanderford, as joint tenants. The Bowens paid the full consideration and early in December of that year went to live there. Bowen died October 18, 1932 and on August 15, 1934 his widow married Carl Vanderford. Since then the Vanderfords have occupied the property.

In so far as pertinent the deed in question, which is dated November 30, 1929 and duly recorded, describes the land by definite metes and bounds as follows: "Beginning at an iron post set in the ground on the north side of the

Ten Rod Road, at the south east corner of the within described premises, thence the line runs northerly, two hundred seventy (270) feet, to an iron post set in the ground, bounding easterly on land of Harold D. Kettelle and Marjorie H. Kettelle, his wife; thence running westerly, two hundred ten, (210), feet to an iron post set in the ground, bounding northerly on land of Harold D. Kettelle and Marjorie H. Kettelle, his wife; thence running southerly two hundred seventy, (270), feet to the Ten Rod Road, bounding westerly on land of Levador E. Browning and Mary Browning, his wife; thence running easterly one hundred eighty five, (185), feet to place of beginning, bounding southerly on the Ten Rod Road."

 The evidence may be divided into two distinct periods: the first, from 1929 to 1934, in which latter year the complainant married Vanderford; and the second, from 1934 to January 20, 1947, when these proceedings were brought. Confining ourselves now to the first period, the complainant testified that during the negotiations for the sale of the premises the respondent, in the presence of his wife, told the complainant and her then husband that all the lots on the northerly side of the Ten Rod Road slanted laterally in a northwesterly direction; that complainant thereupon asked him if the easterly line of the premises "couldn't be straightened"; and that respondent's reply was that "he would straighten the line * * *." No measurements were discussed at that meeting. Unless otherwise indicated we shall hereinafter use the word "line" to mean the easterly line of the premises as claimed by the complainant, who contends that the length of the northerly line described in the deed should be extended fifty feet so that the easterly line of the premises would then be at a right angle with the southerly or road line thereof and run parallel with the easterly side of the house.

Complainant further testified that shortly after taking possession of the premises she, her husband Bowen, and the respondent walked along that entire line; that she then

saw in front of a boulder at the northeast corner of the premises what appeared to be an iron pipe driven into the ground and projecting some distance above it; and that, looking from that point along the line to the southeast boundary, the line so visualized was at a right angle with the road and parallel with the easterly side of the house.

It is clear from complainant's testimony that at that time the land near the road at the southeast corner of the premises was "Just a muddy mess"; and, further, that the land along the easterly side and in back of the house was covered to a considerable extent with brushwood, field stones and boulders. It also clearly appears that she did not know whether her husband Bowen and the respondent had measured and staked the land before the deed was prepared, or who attended to the writing thereof. There was also much testimony from her as to grading and seeding the land for a lawn at the southeast corner, and as to clearing brushwood and planting shrubs for a short distance along a line running parallel to the easterly side of the house. We note here that there is no evidence that Bowen, during his lifetime, ever complained to the respondent about any mistake in the deed or that after his death the complainant personally ever made such a complaint to him.

The evidence relating to the second period, that is, from 1934 to 1947, comes mainly from Carl Vanderford, Rowland P. Bowen, Jr., complainant's son by her first marriage, and Nathaniel G. Hendrick, who carried on a real estate business in the town of North Kingstown. Omitting all reference to many confusing details as to when or where the land was cleared and bushes planted upon or in proximity to the line, the testimony of Vanderford was substantially as follows. He stated that sometime after his marriage to the former Mrs. Bowen she showed him the line; that he then saw an iron post, about 1½ inches thick, in front of a large boulder at the northeast corner of the premises, which post was driven.

into the ground and extended about one foot above the surface.

About 1936 Vanderford, intending to plant some bushes along the line in the vicinity of the house, asked the respondent to show him the starting point thereof at the southeast corner of the premises. In direct examination he testified that the respondent stood at that point and, looking towards the marker in front of the large boulder at the northeast corner, said: "this is your line"; that the boulder was visible from where they stood and he thought "you could discern the marker in front of the stone, it was right up against it"; and that he thereafter "planted those shrubs accordingly." In cross-examination he stated that the respondent not only pointed out the marker but he also walked with him the entire distance of the line from marker to marker. He admitted that at least in 1934 "the back lot was just a mess of bull briers and brush" of considerable size. What, if anything, was done in removing such condition between that time and the incident that we are about to relate is far from clear.

Vanderford testified that in or about 1944, while he and his stepson Rowland P. Bowen, Jr. were "cutting brush out in the back yard * * * Mr. Kettelle came over to us *of his own free will* and stated that he had been looking through his papers and records that he kept in the house and had just found where he had made a mistake and made the back line of our property fifty feet too short and he also said he was perfectly willing to straighten the line because if anything happened to him and his wife was forced to sell, we would have a hard time proving to the new owner that the land was rightfully ours." (italics ours) He further testified that on various occasions thereafter he asked the respondent to carry out such promise and that the latter's usual reply was that he would attend to the matter but he finally said that he had decided to do nothing about it. Vanderford then went to a surveyor who made a plat, which is in evidence and to which we will refer later in

this opinion. The testimony of Rowland P. Bowen, Jr. as to the incident described by Vanderford in the above quotation was substantially to the same effect. At that time he was about thirteen years old.

Nathaniel G. Hendrick, the real estate man, was called as a witness by the complainant. The substance of his testimony in direct examination was that the respondent, who had received a letter from complainant's attorney shortly before the commencement of these proceedings, asked him for advice in the matter; that on that occasion the respondent told him there was a mistake in the deed and that "he had always been ready to rectify it up to a certain time. Then he decided he wouldn't do it," whereupon Hendrick advised him to consult a lawyer.

In cross-examination Hendrick testified that the respondent did not say he was willing to extend the northerly line fifty feet, as the Vanderfords had claimed, and he admitted telling the respondent that "a deed was a very strong instrument and it took very strong evidence to overcome it." His testimony further shows that while this cause was being heard he voluntarily went to the respondent and "tried to prevail upon him to see if these two gentlemen couldn't come to a settlement," but without success because "From Mr. Kettelle about all I seemed to get was what had transpired between the two parties during the beginning," namely, the transaction in 1929.

There is another phase of Hendrick's testimony in cross-examination that requires mention. He testified that about the time of the commencement of these proceedings the Vanderfords, who were considering the sale of their property as "the neighborhood there was getting to be very unpleasant because of what had taken place between them and the Kettelles," asked him to appraise the property; that on this occasion they talked to him about the matter now under consideration; and that he appraised the property for them at that time in accordance with the description in the deed.

The evidence for the respondent came from himself and his wife, the latter's testimony being concerned mainly with the original promise allegedly made to the complainant in 1929 and to a conversation with Hendrick at their home in 1946. Except for the particulars hereinafter stated, their testimony was a positive denial of the promises and admissions upon which the complainant so strongly relies. We will first direct our attention to Kettelle's testimony as to how the dimensions in the deed were ascertained. On this point he testified that shortly after the Bowens had decided to buy the property he and Bowen measured the premises with a steel tapeline, he holding that line and Bowen taking the measurements and making memoranda thereof; that accordingly certain iron posts mentioned in the deed were driven into the ground by them at that time; that Bowen then had the deed prepared in accordance with those measurements; and that upon receiving the deed and finding it to be correct he, the respondent, and his wife executed it and returned it to Bowen. This testimony stands uncontradicted. Moreover, as stated previously, Bowen never complained during his lifetime about any mistake in that deed, nor did the complainant personally make such a complaint after Bowen's death. The respondent also testified that there never was a marker directly in front of a boulder at the northeast corner as claimed by the Vanderfords.

Respondent next denied that in or about 1944 he told Vanderford he had discovered a mistake in the easterly line of the deed and that he then promised to correct such error. He testified that for some years prior thereto the Vanderfords had been encroaching gradually on his land by planting shrubs parallel with the house and along part of a line at a right angle with the southerly boundary of the premises, which line was at variance with the easterly line described in the deed. As to the 1944 incident his testimony in effect was that when he saw Vanderford and his stepson cutting brushwood beyond the lines described in the deed he stopped

them from proceeding further and told them to adhere to the deed lines thereafter.

Respondent's version of his talk with Hendrick concerning the letter from complainant's attorney was in direct conflict with the latter's testimony on that point. He testified that, after reading the letter, Hendrick asked him if he gave a correct deed to the premises and if the grantees "got what the deed calls for." Receiving an affirmative answer to these questions, Hendrick replied: "That's all there is to it. The deed stands," and then added "Throw away the letter and forget about it."

We will now turn to the plat hereinbefore mentioned. The evidence clearly shows that it is no more than a drawing which, as to its most important details, was made mainly in accordance with information furnished by the Vanderfords and not from the surveyor's own observations. After outlining the premises as described in the deed, the draftsman then extended the northerly line easterly fifty feet, and turning a right angle ran a line southerly perpendicular to the southerly boundary of the premises at the undisputed southeast corner thereof. This last line is claimed by the complainant to be the easterly line of her land. As one looks at the plat the area in dispute thus appears as an inverted right-angled triangle having its apex at the southeast corner of the premises and its side perpendicular to the southerly line of the land, the easterly line described in the deed being the hypotenuse of the triangle and the extended northerly line its base.

On close examination of the plat we discovered that the side and hypotenuse of this right-angled triangle are respectively designated as 270 feet in length. It is a mathematical impossibility to have the hypotenuse and side of a right-angled triangle exactly equal in length as shown on complainant's plat. If the easterly line were drawn from the undisputed southeasterly corner of the premises so as to measure exactly 270 feet and terminate at the northerly boundary line it would necessarily deflect northwesterly at

an acute angle and thus coincide with the hypotenuse of the above-mentioned triangle as shown on the plat, which hypotenuse is the easterly line of the premises described in the deed. On the other hand if such a line, 270 feet long, were drawn from the said southeasterly corner so as to form a right angle with the extended northerly boundary line, as shown on complainant's plat, that line would necessarily run beyond the extended northerly boundary line and would not terminate thereat, as erroneously shown on the plat. Such an error in an instrument ordinarily accepted as mathematically correct created an optical illusion that was decidedly misleading in weighing conflicting testimony as to whether there was a mutual mistake.

We further note here that while certain iron posts, according to both the deed and the evidence, are shown on the plat not one of them was found by the surveyor on his field survey in 1947. When or by whom the markers originally placed by Bowen and respondent were removed does not appear of record. Furthermore, the septic tank mentioned early in this opinion, which was apparently unmarked on the surface of the ground, was not seen by the surveyor. Although it appears on the plat as a definitely located object, he admitted that he was "shown the approximate location" by Mr. Vanderford.

We have reviewed the material evidence in more than ordinary detail because we are unable to agree with the decision of the trial justice. Since this is a bill for the reformation of a deed on the ground of mutual mistake, it was necessary to establish such mistake by clear and convincing evidence before a reformation of such an instrument should be granted.

Apart from his discussion of the law, the rescript of the trial justice, which is couched in broad and general language, in substance adopts the evidence for the complainant as if it were either admitted or undisputed. Although he states that the "stories told by complainant and by the respondents are completely at variance on vital incidents,"

he fails to identify those incidents or to give us the benefit of his judgment as to the probabilities connected therewith. We have found no expression by him passing unfavorably on the credibility of either respondent, thus providing no reason why he practically disregarded all of the evidence adverse to the complainant. On the question of the probabilities in connection with the testimony of Vanderford and his stepson as to the incident in 1944 and that of Hendrick respecting the occurrences in 1946 we are convinced that the testimony of the respondent and his wife on the same points is at least as probable and credible as that of complainant's witnesses.

The trial justice further says in his rescript that the complainant was in "actual and exclusive possession" of the disputed parcel of land "continuously from the time possession was taken in November, 1929 until shortly before this litigation commenced. In the interim both the Bowens and the respondents at all times acted in relation to said disputed parcel as if the deed had included the same." In our judgment this statement not only completely overlooks much pertinent evidence for the respondent on the question of complainant's use and occupation of the disputed area, but it also misconceives the legitimate scope of the evidence for the complainant on that point. With the exception of some grading at the southeast corner shortly after the Bowens entered into possession in 1929, and the planting of shrubs by the Vanderfords at different times after 1936 for a relatively short distance back from the road and parallel to the easterly side of the house, the evidence with reference to the nature and extent of complainant's use and occupation of the disputed area, especially around the northeast corner, is decidedly fragmentary and uncertain. Furthermore, there is testimony by the respondent that when he complained that the shrubs were being planted on his land Vanderford did not claim it by purchase and deed but replied: "Possession is nine points of the law and possession holds it."

Two other matters appearing in the rescript are worthy of mention: first, the trial justice's reference to the measurements on the plat hereinbefore discussed; and, secondly, his statement that he viewed the premises during the hearing of this cause. It may be that the combined effect of both these matters was to divert his attention from the fundamental question at issue before him, namely, whether the deed should be reformed because of a mutual mistake by the parties *in 1929*. On due consideration the plat is in substance nothing more than a graphic representation of complainant's claim. It is not only of no probative value as to the merits of the controversy but also is decidedly misleading. In our opinion the trial justice was apparently misled by the erroneous markings on the plat indicating that the easterly and westerly boundaries of the disputed area, as shown respectively by the side and hypotenuse of the right-angled triangle on the plat, were of equal length. He apparently accepted that fallacy as a proven fact because he says in his rescript that both lines "are 270 feet long." If this were true, it would be a circumstance by way of reasonable inference tending to establish that the parties might have made a mutual mistake in measuring the length of the northerly boundary line. However, since the premise for such an inference is false, then the inference itself must fall as not supported by any competent evidence and the result tends to corroborate the deed and the respondent's testimony.

It is also clear from the evidence that when the trial justice viewed the premises in 1947 the appearance of complainant's land at its southeast corner was by no means the same as in 1929. The grading of that corner and the planting of shrubs by the complainant along the easterly line now claimed by her created a condition which might readily mislead an observer to believe that the *then* existing condition had continued from the date of the deed and that the parties had mistakenly described the easterly line therein, especially since the physical appearance of that

corner in 1947 coincided with the representation of complainant's claim as it appeared on the plat.

In our judgment the basic issue in this cause is one of fact to be decided under well-established principles of law. It is to be presumed that a written instrument as drawn and executed, especially a deed, correctly states the real intent of the parties. To warrant the reformation of such an instrument it must not only appear that the parties had come to a prior complete understanding respecting the essential terms of the agreement between them, but also that because of their *mutual* mistake the instrument failed correctly to express that agreement in some material respect.

A mutual mistake is one common to both parties where each labors under a misconception respecting the same terms of the written agreement sought to be corrected. As this court said in *Diman* v. *Providence, Warren, and Bristol R. R.,* 5 R. I. 130, at page 134, the mistake which the court may correct in a written instrument "must be, as it is usually expressed, the mistake of *both* parties to it; that is, such a mistake in the draughting of the writing, as makes it convey the intent or meaning of neither party to the contract." A mistake by one party coupled with ignorance thereof by the other party does not constitute a mistake within this rule. On a bill for reformation the court can do no more than to make an instrument convey the meaning that both parties intended.

In order to prevail in this class of cases it is well settled that the complainant must prove a mutual mistake by clear and convincing evidence, meaning thereby that the evidence should be such that the mind has no difficulty in reaching a point of decision. In cases for reformation it is the duty of the court to scrutinize the evidence and "proceed with great caution upon evidence resting in parol." *Allen* v. *Brown,* 6 R. I. 386, 397. To warrant reformation the credibility of the witnesses and the weight of the evidence must be such as clearly to convince the court without hesitancy of the truth of the precise facts in issue.

Where there is no fraud, a deed is strong evidence of the intention of the parties. In the instant cause the complainant, who claims no fraud, seeks to reform such an instrument on the ground of an alleged mutual mistake purportedly shown by parol evidence of conversations and by evidence of conduct in the use and occupation of the disputed area. The respondent denied the conversations and the nature and extent of such use and occupation. In the absence of any adverse comment by the trial justice and from our reading of the evidence as a whole, we find nothing in the record before us to indicate that the testimony of either respondent was inherently improbable or marked with such a degree of self-interest, exaggeration, evasion, or inconsistency as to affect its credibility. We therefore find no reason for rejecting the evidence for the respondent. Assuming that the evidence for the complainant is of equal credibility it cannot be said that she established a mutual mistake by clear and convincing evidence.

It is well settled that the findings of fact of a trial justice will not be set aside unless they are clearly wrong. In the instant cause, however, we are of the opinion that his decision is clearly wrong in that through misconception of certain material evidence he relied mainly on evidence of little or no value and as a result thereof he was misled to overlook or misconceive evidence of probative force. In so doing he granted reformation of the deed on the ground of mutual mistake when such mistake had not been proved by clear and convincing evidence.

The appeal of the respondents is sustained, the decree appealed from is reversed, and the cause is remanded to the superior court for the entry of a decree denying and dismissing the bill of complaint.

*Letts & Quinn, Daniel J. Murray,* for complainant.

*James O. Watts,* for respondents.